UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EL-SAYED DAHMAN,<br><br>　　Plaintiff,<br><br>　　v.<br><br>THE EMBASSY OF THE STATE OF QATAR<br><br>　　and<br><br>THE STATE OF QATAR,<br><br>　　Defendants. | Civil Action No. 17-2628 (JEB) |

**MEMORANDUM OPINION**

Plaintiff El-Sayed Dahman brought this suit against both the Embassy of Qatar and the country itself, alleging that they violated the Age Discrimination in Employment Act and the District of Columbia Human Rights Act in terminating his employment as Chief Accountant for the Embassy here in Washington.  When Defendants never appeared, the Clerk of the Court entered default against them, and Plaintiff now moves for a default judgment in the amount of $11,224,871.  Finding sovereign immunity no bar to liability here and Dahman's claim meritorious, the Court will grant his Motion but order an evidentiary hearing to determine the appropriate amount of damages.

I.　　Background

Seventy-year-old Dahman is an Egyptian citizen and Virginia resident.  See ECF No. 16, Exh. 4 (Declaration of Plaintiff), ¶¶ 1-2.  He began working for the Washington-based Embassy of Qatar in 1995 as an accountant and became the Director of the Accounting Department the

1

following year. Id., ¶¶ 3, 10-11. During his 21-year tenure he received "praise[ ] [for his] work performance, including the quality of [his] work, [his] loyalty and dedication, and the exercise of [his] expertise in [his] field." Id., ¶¶ 3, 13. Plaintiff's contract with the Embassy, however, stated that it would expire when he reached age 64. Id., ¶ 11. Although Defendants waited for several years past that deadline, they "terminated him" on January 5, 2016. Id., ¶ 6. Plaintiff claims he was released "solely [because of his] age" without any other cause, evidenced by the express language in his termination letter. Id.; ECF No. 16, Exh. 10 (Termination Notice). On December 12, 2017, after receiving a right-to-sue notice from the Equal Employment Opportunity Commission, Plaintiff brought this suit alleging two counts against the Embassy and State of Qatar for "unlawful[ ] discriminat[ion] . . . on the basis of [Plaintiff's] age": 1) violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621; and 2) violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401. See Compl., ¶¶ 32, 37.

After serving both Defendants in February 2018 and receiving no response from either, Plaintiff filed Affidavits for Default against the Embassy and the State on April 12 and April 16, respectively. See ECF Nos. 11 (Embassy), 12 (State). The Clerk entered default as to both Defendants the following week. See ECF Nos. 13-14 (Entries of Default). On May 10, Plaintiff filed the current Motion for Default Judgment, see ECF No. 16, which has not been opposed.

## II.     Legal Standard

In seeking default judgment against a foreign state, Plaintiff needs to prove "his claim or right to relief by evidence satisfactory to the court," which Congress noted is the "same requirement applicable to default judgments . . . under rule 55(e), Fed. R. Civ. P." 28 U.S.C. § 1608(e); H.R. REP. 94-1487, 26, 1976, reprinted in U.S.C.C.A.N. 6604, 6625. Default judgment may be entered where a defendant is "totally unresponsive," and its default is plainly willful, as

reflected by its failure to respond to the summons and complaint, the entry of default, or the motion for default judgment. Gutierrez v. Berg Contracting Inc., 2000 WL 331721, at *1 (D.D.C. March 20, 2000) (citing Jackson, 636 F.2d at 836) (internal quotation omitted). In the "'absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense,' it is clear that the standard for default judgment has been satisfied." Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (quoting Gutierrez, 2000 WL 331721, at *1).

Nevertheless, "[m]odern courts are . . . reluctant to enter and enforce judgments unwarranted by the facts," Jackson, 636 F.2d at 835, and "a district court may still deny an application for default judgment where the allegations of the complaint, even if true, are legally insufficient to make out a claim." Gutierrez, 2000 WL 331721, at *2 (citing Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980)).

Under the FSIA, moreover, there is a heightened standard for default judgment because of sovereign immunity. See 28 U.S.C. § 1608(e); Weinstein v. Islamic Republic of Iran, 175 F. Supp. 2d 13, 19-20 (D.D.C. 2001) ("[D]efault judgments under the FSIA require additional findings than in the case of ordinary default judgments."). The Court has "a duty to scrutinize [P]laintiff's allegations," and should not "unquestioningly accept a complaint's unsupported allegations," Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). Even if the foreign state fails to make an appearance, the court must still determine that an exception to immunity applies and that the plaintiff has a sufficient legal and factual basis for his claims. See Jerez v. Republic of Cuba, 777 F. Supp. 2d 6, 18–19 (D.D.C. 2011).

3

**III. Analysis**

As one might expect when a foreign country or its embassy appears as a defendant, the critical threshold issue to resolve is that of sovereign immunity. In fact, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, is the "sole basis for obtaining jurisdiction over a foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). The Court must consequently make the initial determination that it has subject-matter jurisdiction before hearing the merits.

Before proceeding to the FSIA analysis, another issue looms. While the Act indisputably applies to the State of Qatar, does the Embassy also enjoy its protection? The answer is clearly in the affirmative. The FSIA defines "foreign state" as "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). "Courts have uniformly found that embassies are 'integral part[s] of a foreign state's political structure,' and therefore appropriately considered 'foreign states' for FSIA purposes." De Sousa v. Embassy of Repub. of Angola, 229 F. Supp. 3d 23, 26 (D.D.C. 2017) (quoting Transaero, Inc. v. La Fuerza Aerea, 30 F.3d 148, 151 (D.C. Cir. 1994)). The FSIA thus applies to the Embassy here.

In looking at the FSIA, there are two issues that arise — namely, personal and subject-matter jurisdiction. The Act's "'interlocking provisions' . . . compress subject-matter jurisdiction and personal jurisdiction into a single, two-pronged inquiry: (1) whether service of the foreign state was accomplished properly, and (2) whether one of the statutory exemptions to sovereign immunity applies." Abur v. Republic of Sudan, 437 F. Supp. 2d 166, 172 (D.D.C. 2006)

(quoting Mar. Int'l Nominees Estab't v. Republic of Guinea, 693 F.2d 1094, 1099 (D.C. Cir. 1982)). Dahman believes he has satisfied both prongs. The Court will address each in turn and then briefly look at the merits and the issue of damages.

A. Service of Process

Under Fed. R. Civ. P. 4(j)(1), one who serves a "foreign state or its political subdivision, agency, or instrumentality must [do so] in accordance with 28 U.S.C. §1608"; see also 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."). Here service was effected on both the State and the Embassy.

1. *The State of Qatar*

For the State of Qatar, § 1608(a) controls, and it provides that service on a foreign state or its political subdivision must be made

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the

5

> Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

These four methods for service under § 1608(a) are listed "'in descending order of preference[,]' and a plaintiff 'must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on.'" Angellino v. Royal Family Al-Saud, 688 F.3d 771, 773 (D.C. Cir. 2012) (quoting Ben–Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)). Plaintiff here has followed § 1608(a) to the letter with respect to service on the State of Qatar. His counsel contacted Defendant's counsel on January 29, 2018, regarding a special arrangement pursuant to (a)(1), but after a brief exchange, Defendant's counsel stated that separate counsel would be retained and would contact Plaintiff; however, no such counsel ever reached out. See Pl. Mot., Exh. 24 (Dilley Email). Dahman then pivoted to service under § (a)(2), but found that no "applicable international convention on service of judicial documents" was available because Qatar has not signed any such convention. Id., Exh. 23 (Request for Service of Process).

Left with the next option at (a)(3), Plaintiff successfully requested that the Clerk of the Court send one copy of the summons, complaint, notice of suit, and translations of those documents into the official language of Qatar — i.e., Arabic — to the head of the ministry of foreign affairs via the DHL mailing service on February 7, 2018, and received proof of service on February 11. See ECF No. 6 (Affidavit Requesting Foreign Mailing); Pl. Mot., Exh. 18 (Proof of Service); Exh. 20 (Affidavit in Support of Default for State of Qatar). As § 1608 requires no more than this, Plaintiff has successfully served the State of Qatar.

2. *Embassy of the State of Qatar*

The FSIA contains different processes for service depending on whether the entity to be served is a "foreign state or political subdivision of a foreign state" or an "agency or instrumentality of a foreign state." 28 U.S.C. § 1608(a)-(b). The distinction turns on "whether the core functions of the foreign entity are predominantly governmental or commercial." Transaero, Inc., 30 F.3d at 151. As an embassy's core functions are predominantly governmental, proper service is governed by § 1608(a) — *i.e.*, a foreign state or political subdivision — rather than the "more lenient requirements" of § 1608(b), which permits sending the complaint, summons, and translations of each "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served" when no special arrangement, international convention, or specific request exist. See Barot v. Embassy of the Republic of Zambia, 785 F.3d 26, 28 (D.C. Cir. 2015) (analyzing proper service on Embassy of Zambia under § 1608(a)). This makes sense since embassies as governmental organs may lack the "sophisticated knowledge of the United States legal system" that "international commercial enterprises" falling under § 1608(b) may possess. Transaero, Inc., 30 F.3d at 154. Once again, as neither of the first two methods regarding "special arrangement for service" between Plaintiff and the Embassy or an "international convention on service of judicial documents" applies, see 28 U.S.C. § 1608(a)(1)-(2), Dahman must serve the Embassy in accordance with § 1608(a)(3).

Originally, Plaintiff mistakenly followed § 1608(b). He sent a copy of the complaint and summons, along with a translation of each into Arabic, see Pl. Mot., ¶ 2; ECF Nos. 3 (Affidavit Requesting Foreign Mailing), 5 (Certificate of Mailing), 9 (Proof of Service), to the Clerk of the Court to send to the "Embassy of the State of Qatar" at its Washington, D.C., address at 2255 M

Street, Northwest.  See Proof of Service.  Plaintiff then corrected this service and, once again following the requirements of § 1608(a), asked the Clerk to serve the head of the ministry of foreign affairs at his office in Almirqab Tower, West Bay, Doha, Qatar on February 11, 2018. See Affidavit Requesting Foreign Mailing; Request for Serv. of Process; ECF No. 15 (Proof of Service).  As Plaintiff has thus ensured proper service with "strict adherence to the terms of 1608(a)," Transaero, Inc., 30 F.3d at 154, the Court may conclude that the service box as to both Defendants is now checked.

B.  Sovereign-Immunity Exception

Dahman must next establish that one of the FSIA's statutory exceptions to sovereign immunity exists here.  He relies on the commercial-activity exception, which states that "[a] foreign state shall not be immune from the jurisdiction of courts . . . in any case . . . in which the action is based upon commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  The Court "focus[es its] commercial activity analysis on the employment relationship between [Plaintiff] and the . . . embassy as a whole, rather than narrowly on [Plaintiff]'s termination alone."  El-Hadad v. United Arab Emirates, 496 F.3d 658, 663 n.1 (D.C. Cir. 2007); see also Ashraf-Hassan v. Embassy of France in the U.S., 610 F. App'x 3, 5 (D.C. Cir. 2015) (finding that "there is little doubt that Appellee's hostile work environment claims are necessarily premised on the course of her employment at the Embassy," and that such employment constituted commercial activity) (citing Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).

Although Plaintiff's suit is clearly based upon his employment by Defendants, he must still show that such employment was in fact "commercial activity."  Courts have recognized that a foreign government divests itself of its sovereign nature and associated protections when it

8

"acts, not as regulator of a market, but in the manner of a private player within it," and thus its "actions are 'commercial' within the meaning of the FSIA." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992). The Supreme Court clarified in Nelson that a state engages in commercial activity for the purposes of the FSIA exception when "it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" 507 U.S. at 360 (quoting Weltover, 504 U.S. at 614).

The D.C. Circuit provided the framework for such analysis in the very similar case of El-Hadad, in which a former accountant of the U.A.E.'s embassy in Washington sued the Emirates and its embassy for breach of contract and defamation. The court there established a two-step test to determine whether a foreign state has engaged in commercial activity with respect to the plaintiff's employment. Courts look at: 1) whether the worker is a civil servant of the state he is suing; and 2) whether his employment constitutes commercial activity. El-Hadad, 496 F.3d at 664-65. Under this test, if evidence shows that the plaintiff is a civil servant, then the analysis stops there, as "a foreign government's civil servants (and diplomats and soldiers) do not qualify for the commercial activity exception," and the government is thus presumptively immune from suit. Id. at 664. If, conversely, the plaintiff is not a civil servant, then the court may "go on to scrutinize whether his work involves the exercise of 'powers that can also be exercised by private citizens.'" Id. (quoting Nelson, 507 U.S. at 360). The Court will thus examine each issue.

1. *Civil-Servant Status*

The D.C. Circuit in El-Hadad further broke down the first question about civil-servant status into a list of "five generally relevant considerations[,] . . . noting that the list is not

exclusive, necessarily applicable in all cases, or, unfortunately (but unavoidably), analytically precise." Id. at 665.

> First, how do the U.A.E.'s own laws define its civil service, and do El–Hadad's job title and duties come within that definition?
>
> Second, what was the nature of El–Hadad's employment relationship with the U.A.E.? Did he have a true contractual arrangement, or is his "contract" claim instead based, as the U.A.E. contends, solely upon the civil service laws of the U.A.E.?
>
> Third, what was the nature of El–Hadad's employment relationship when he worked in the U.A.E., and how did his subsequent employment at the Embassy relate to that prior tenure? . . .
>
> Fourth, what was the nature of El–Hadad's work? . . . Congress indicated that the "employment or engagement of laborers, clerical staff or public relations or marketing agents" would come within the definition of commercial activity.
>
> Fifth, what is the relevance of El–Hadad's Egyptian nationality on the facts of this case? Is the U.A.E. a country in which, as the House Report assumed, non-nationals are unlikely to be employed as governmental officers? Or does the U.A.E. often employ non-nationals in governmental positions?

Id.

As to the first, although Dahman does not define what a civil servant is under Qatari law in his pleadings, his second employment contract clearly states that he is not to be awarded any "Qatari Civil Service benefits or . . . any other benefits, rights or remedies provided by the law of the State of Qatar." Pl. Mot., Exh. 8 (Local Employment Contract) at 2. This seems dispositive of the first point, as the court in El-Hadad, faced with nearly identical facts, agreed. See 496 F.3d at 665-66 ("[W]e find it of some help that a 1994 letter from the U.A.E. embassy's cultural attaché states that El–Hadad 'doesn't have the [c]ivil servant benefits.' . . . [I]t is powerful evidence that El–Hadad was not a civil servant according to U.A.E. law.").

Turning to the second consideration, it appears from the record as though Plaintiff's employment was governed initially by a "Local Work Contract" when he was first hired in 1995, but then superseded by a second "Local Employment Contract" in 1996 when he took his second and final position at the Embassy as Director of the Accounting Department. See Pl. Mot., Exh. 7 (Local Work Contract) at 1; Local Empl. Contract at 1. The latter appears to be an agreement not governed solely by the civil-service laws of Qatar because Plaintiff is not referred to as a civil servant in any of the employment documents. Although there is also a "Governing Law" section of the contract, which specifies that it "shall be governed by the laws of the State of Qatar," Local Empl. Contract at 7, this does not mean Dahman worked under the civil-service laws of that state. This factor thus resolves in Plaintiff's favor.

The third consideration from El-Hadad does not apply to Dahman's claim against Qatar because no evidence suggests that he was already a civil servant who simply transferred from Qatar to the Embassy in the U.S., as was the case in El-Hadad.

The fourth factor looks at the nature of Dahman's work. Although he doubtlessly handled a large amount of government information and data while working as an accountant at the Embassy, there is nothing inherently non-commercial about such work. Accountants at private companies often perform the same duties that he did. See Pl. Mot., Exh. 9 (Dahman Resume) at 1-2; Pl. Decl., ¶ 12 (Dahman's work included "preparing annual Embassy budgets and reports[,] compliance with external annual audits[,] . . . supervising and monitoring the work of the accounting team[,] . . . and auditing . . . fees," but not diplomatic or policy work). To the extent that he functioned as a supervisor, his duties were "ministerial, not discretionary," El-Hadad, 496 F.3d at 668 (citation omitted), and all of his work was of "a character easily found in commercial enterprise." Id. As Plaintiff points out, moreover, one could replace "Embassy"

11

with "corporation," and his resume would read as that of an accountant at any major firm. See Pl. Memo. at 15-16. Dahman "is more like the employees for whom Congress intended FSIA's commercial exception," El-Hadad, 496 F.3d at 666, such as "laborers, clerical staff or public relations or marketing agents" than a civil servant. Id. at 665 (citation omitted); see also H.R. Rep. No. 94-1487, at 16.

Finally, the last factor relates to Plaintiff's nationality. The court in El-Hadad held that "[w]here a country rarely . . . hires non-citizens for its civil service[,] . . . non-citizenship strongly indicates that someone is not a civil servant[,] . . . [but] citizenship makes someone more likely to qualify as a civil servant even if a country sometimes hires noncitizens as civil servants." 496 F.3d at 667. Plaintiff asserts that his Egyptian citizenship "meant he was not entitled to any benefits . . . that Qatar might afford to it owns [sic] citizens," implying that non-Qatari nationals would not be hired as civil servants. See Pl. Memo. at 14; see also Local Empl. Contract at 2. This point, however, is rendered inconclusive as Plaintiff has not provided evidence of Qatar's hiring policy with respect to non-citizens in its civil service. See El-Hadad, 496 F.3d at 667.

As the balance of factors therefore shows he is not a civil servant, the Court now moves to the second El-Hadad inquiry.

  2. *Commercial or Governmental Activity*

Plaintiff must next demonstrate that his employment constituted commercial activity. Here, the FSIA provides some guidance, stating that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). In other words, the outward form of the activity matters more than the purpose behind it. If an employee audits a

military project, for example, it is still considered commercial activity because auditing itself is commercial in nature, despite the policy purposes that might drive such an audit. See Republic of Argentina, 504 U.S. at 614 (section 1603(d) "provides that the commercial character of an act is . . . determined by reference to its 'nature' rather than its 'purpose'[;] . . . [the] issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce'") (citation omitted).

Having found that Dahman is not a civil servant, the Court must next consider whether he nonetheless "engaged in quintessentially governmental work." El-Hadad, 496 F.3d at 664. While a civil servant is by definition not engaged in commercial activity, the converse is not necessarily true. Id. The court in El-Hadad aptly noted that "the [civil-servant] inquiry might well illuminate the [commercial-activity inquiry]." Id. at 664 & n.2. Here, likewise, the discussion of the fourth El-Hadad consideration listed above demonstrates that Dahman's work was commercial in nature, not only because his duties were the same as an accountant working for a private company, but also because Dahman's job lacked a "distinctive mark of governmental work" — namely, "discretionary involvement with sovereign law or policy." Id. at 668. Qatar "exercise[d] 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns'" and acted "'in the manner of a private player within' the market" when it decided to employ Dahman as an accountant. See Nelson, 507 U.S. at 360 (quoting Weltover, 504 U.S. at 614); cf. Jin v. Ministry of State Sec., 557 F. Supp. 2d 131, 141 (D.D.C. 2008) (holding that foreign state's employment of thugs physically harassing Falun Gong members was not commercial activity under the FSIA).

Although they never appeared here, Defendants did respond to the initial EEOC charge filed, raising three arguments opposing the applicability of the commercial-activity exception. They first pointed out that, "[c]onsistent with the significant governmental responsibilities assigned to Mr. Dahman, the Embassy requested in 1995 that the U.S. State Department designate Mr. Dahman as a 'member of the administrative and technical staff,'" noting that such a designation was covered under the Vienna Convention on Diplomatic Relations. See Pl. Mot., Exh. 15 (EEOC Response) at 3; VCDR art. 1, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95.

Defendants, however, failed to note that article 1 of the Convention clearly distinguishes "administrative and technical staff" from "diplomatic staff," and on its face, "significant governmental responsibilit[y]" of a policymaking nature would be <u>inconsistent</u> with the duties expected of administrative or technical staff. A State Department handbook "consistent with the Vienna Convention on Diplomatic Relations" likewise states that "[administrative and technical] staff and consular employees may be, for example, security guards, administrative officers or assistants, purchasing agents, or clerks," hardly the kind of employees making policy or holding discretionary authority. See U.S. Dep't. of State – Office of Foreign Missions, Accreditation Handbook, 2, 11 (August 23, 2016), https://www.state.gov/documents/organization/261433.pdf. A designation of "administrative and technical staff" under the VCDR, therefore, is not mutually exclusive with the determination that the <u>nature</u> of Plaintiff's work was still commercial, though it may have been for a governmental purpose or function.

Defendants next noted that Plaintiff was exempt from federal income tax. Pursuant to 26 U.S.C. § 893(c)(2), "any employee of a foreign government whose services are primarily in connection with a commercial activity . . . of the foreign government" <u>shall not</u> be exempt from federal income tax. Defendants thus argue that Plaintiff's employment could not have been in

14

connection with commercial activity since he made use of the tax exemption under § 893. See EEOC Resp. at 3-4. Treasury regulations, however, define commercial activities not under the Nelson test or El-Hadad multi-factor inquiry, but as "all activities . . . which are ordinarily conducted . . . with a view towards the current or future production of income or gain," but not including investments, cultural events, non-profit activities, governmental functions, and the purchasing of goods. See 26 C.F.R. § 1.892-4T. There is a distinct difference between commercial activity as so defined and such activity under the FSIA. As a result, no disconnect exists between Dahman receiving a tax break for work not connected to Treasury's "commercial activity" and his still being able to contend that his employment relationship with Qatar was appropriately categorized as commercial activity under the El-Hadad and Nelson criteria.

Defendants' final argument regarding Dahman's A-2 visa status is even less convincing. They assert that per State Department regulations, A-2 visa holders cannot be "[g]overnment officials traveling to the United States to perform non-governmental functions of a commercial nature," and thus "Mr. Dahman's [A-2] visa status expressly did not permit him to engage in governmental functions of a commercial nature." EEOC Resp. at 4. Yet, no adverse conclusion should be drawn from the regulation. In the first place, employees who perform non-governmental functions of a commercial nature cannot receive A-2 visas, but the regulations do not prevent visa holders from performing governmental functions of a commercial nature. In fact, the State Department regulation cited by Defendants supports such a view, stating that "[f]ull-time employee[s] assigned by that government, coming only to work at a foreign embassy or consulate in the United States, to perform duties which take place at an embassy" are eligible for A-2 visas. See U.S. Dept. of State – Bureau of Consular Affairs, Visas for Diplomats and Foreign Government Officials, https://travel.state.gov/content/travel/en/us-visas/other-visa-

15

categories/visas-diplomats.html. There is no inconsistency in holding that Dahman's employment constituted "commercial activity" but not "<u>non-governmental</u> functions of a commercial nature."

Although "[m]ultifactor tests tend to be inconclusive," <u>El-Hadad.</u>, 496 F.3d at 667, the evidence submitted by Plaintiff shows that he was not a civil servant nor was his employment of a non-commercial nature. The Court can therefore allow his suit against the State and Embassy of Qatar to move forward under the commercial-activity exception to the FSIA.

C. <u>Merits</u>

Now that the Court has established jurisdiction, it must determine whether Dahman's claims of discrimination under the ADEA and the DCHRA are meritorious. The former Act makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). People 40 years of age and older fall within the statute's purview. <u>Id.</u>, § 631(a). "To prevail, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.'" <u>DeJesus v. WP Company LLC</u>, 841 F.3d 527, 532 (D.C. Cir. 2016) (quoting <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 177-78 (2009)); <u>see also</u> <u>Schuler v. PricewaterhouseCoopers, LLP</u>, 595 F.3d 370, 376 (D.C. Cir. 2010). "One example of direct evidence is a statement that itself shows . . . bias in the [employment] decision," <u>Steele v. Carter</u>, 192 F. Supp. 3d 151, 165 (D.D.C. 2016) (internal quotation marks and citation omitted), made by "decision makers, or those who have input into the decision [to terminate the employee]." <u>Forman v. Small</u>, 271 F.3d 285, 293 (D.C. Cir. 2001). While the ADEA spells out various exceptions, <u>see</u> § 623(f), none applies here.

16

In addition, the Court believes that the ADEA covers an Egyptian citizen employed at a foreign embassy in the U.S. Cf. Gaujacq v. Electricite de France Int'l. N. Am., Inc., 572 F. Supp. 2d 79, 86 (D.C. Cir. 2008) ("Title VII applies to foreign companies operating in the United States, and is intended to protect aliens working in the United States as well as citizens."); see also Barot v. Embassy of Republic of Zambia, 299 F. Supp. 3d 160, 177 & n.16 (D.D.C. 2018) ("Title VII and the ADEA apply to foreign employers doing business in the United States," including Embassy of Zambia).

Given the facts in the record, the Court finds that Plaintiff has met his burden under the ADEA. Dahman, who was 68 at the time of termination, is easily covered by the Act. See Pl. Decl., ¶ 4. As for causation, his contract stated, "[T]his [ ] Contract shall expire when Employee reaches the age of 64 years." Local Empl. Contract at 5. Even worse, Dahman received a termination letter signed by Ambassador Mohamed Jiham Al Kawari on November 17, 2015, which provided only one reason for firing him: "solely" because he was "reaching [his] retirement age." Pl. Decl., ¶ 7; Pl. Mot., Exh. 10 (Notice of Termination). This statement from the Ambassador — Plaintiff's direct supervisor, who was involved in the hiring and dismissal process for Embassy employees — directly demonstrates age discrimination. See Pl. Memo. at 4. The termination notice also referred to a previous letter Dahman received in July from the Director of Human Resources — who was also involved in hiring and termination decisions — that notified him of the Embassy's decision to end his services "due to [Plaintiff] being over the age of 64." Pl. Decl., ¶ 7; Pl. Memo. at 4; Exh 11 (Human Resources Letter).

There is thus no argument that Plaintiff was fired for good cause or any other legitimate reason. Indeed, the Ambassador listed age as the only reason for termination while thanking Plaintiff for "the efforts [he] ha[s] exerted through over 20 years of services with dedication,

sincerity & trust in [his] performance." Termination Notice. Throughout his employment, during which he served six Ambassadors, Dahman received "several letters from the Embassy praising his loyalty and quality of work" and his "honorable performance" of "high quality" that "would benefit the embassy a lot for the years to come." Pl. Memo. at 2; Pl. Mot., Exh. 13 (Decl. of Abla Abdel Baset Youssef), ¶ 8; Pl. Mot., Exhs. 5-6 (Letters of Commendation). Plaintiff, evidently, was performing his job functions adequately, and he avers that he did not plan to retire until he was 80. See Pl. Decl., ¶ 21; Baset Decl., ¶ 6. Although some bona fide seniority systems are lawful under the ADEA, none "shall require or permit the involuntary retirement of any individual . . . because of the age of such individual." 29 U.S.C. § 623(f)(2). Dahman's contract listing a mandatory retirement age "shows that the Embassy knew or showed reckless disregard for the prohibition of age-based employment discrimination" under the ADEA. See Pl. Decl., ¶ 20; see also Miller v. Clinton, 687 F.3d 1332, 1351 (D.C. Cir. 2012) (holding State Department was not exempt from ADEA suit after terminating an employee solely based on his age because of a negotiated and signed contract containing a mandatory retirement age of 65). Dahman has thus provided direct evidence of discrimination, showing that age was the but-for cause of his termination.

As to his second count, the DCHRA proscribes discriminatory employment practices based on an employee's "race, color, religion, national origin, sex, age, . . . or political affiliation," among other things. See D.C. Code § 2–1402.11(a). The Act makes it illegal to "discriminate against any individual, with respect to . . . compensation, terms, conditions, or privileges of employment, including promotion." Id. § 2–1402.11(a)(1). To adequately plead discriminatory treatment under the DCHRA, therefore, Plaintiff must establish that: (1) [ ]he is a member of a protected class; (2) [ ]he suffered an adverse employment action; and (3) the

18

unfavorable action gives rise to an inference of discrimination. See Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (listing Title VII requirements) (citation omitted); Koger v. Reno, 98 F.3d 631, 633 (D.C. Cir. 1996) ("Age discrimination is governed by the . . . [same] analysis developed in the Title VII context."). "The courts of the District of Columbia 'look[ ] to federal court decisions interpreting the [ADEA] when evaluating age discrimination claims under the DCHRA.'" Schuler, 595 F.3d at 376 (quoting Washington Convention Ctr. Auth. v. Johnson, 953 A.2d 1064, 1073 n.7 (D.C. 2008)). Although the D.C. Circuit has declined to decide whether a plaintiff under the DCHRA must show that age was the "but-for" cause of the adverse action (as under the ADEA) as opposed to a lesser standard, Schuler, 595 F.3d at 376, this Court need not resolve this question. This is because Dahman satisfies both standards, as just explained above in relation to his ADEA claim.

    D.    <u>Damages</u>

Having established liability, the Court finally addresses damages. Under the ADEA, Dahman seeks reinstatement or, in the alternative, ten years of front pay, along with commensurate benefits and medical-insurance coverage; back pay starting from his date of termination to the present day, also with benefits and insurance; severance pay, totaling $2,261,583 as of May 2018; and liquidated damages. See Pl. Memo at 28-29. He also requests the same front and back pay under the DCHRA, along with compensatory and punitive damages, totaling $8,963,288. Id. at 29-32. The Court will not, however, award a set sum of damages now, as a hearing seems the more prudent course.

Although "[t]he court need not make this determination through a hearing" and "may rely on detailed affidavits or documentary evidence to determine the appropriate sum," Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C. 2001), it requires more here to support the outsized sum

19

sought. See Owens v. Republic of Sudan, 864 F.3d 751, 767 (D.C. Cir. 2017) ("The court held a consolidated evidentiary hearing in order to satisfy [the § 1608(e)] requirement in the FSIA . . . . [W]ithout considering this evidence, the court could not transform the orders of default into enforceable default judgments establishing liability and damages against Sudan."); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 261 (D.D.C. 2003) ("Despite the defendants' willful default, the court had to conduct an evidentiary hearing before it could enter a judgment by default against the defendants [and award damages].").

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Dahman's Motion for Default Judgment in part and set an evidentiary hearing for damages. The Court will issue a contemporaneous Order reflecting such decision.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: July 26, 2018~~July 25, 2018~~